In re Scott A. BURDICK, Joyce M. Burdick, Debtors.

In re Harold LAYAW, Victoria Layaw, Debtors.

In re Cherie OVEREND, Debtor.

Bankruptcy Nos. 95–60573, 95–60206 and 95–60103.

United States Bankruptcy Court, N.D. New York.

Jan. 4, 1996.

Michael Collins, Office of the U.S. Trustee, Utica, New York.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court are the motions of Michael E. Collins, Esq. of the Office of the U.S. Trustee ("UST") requesting that the Court impose penalties upon Patricia Dattolo ("Dattolo") pursuant to § 110 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). The UST's motion was interposed on May 18, 1995, in the three cases herein filed under Chapter 7 of the Code.

The motions were heard at a regular motion term of the Court in Syracuse, New York on June 20, 1995. At the request of the UST, the three cases were scheduled for a consolidated evidentiary hearing on August 17, 1995, in Utica, New York. The Court heard testimony from Joyce Burdick ("Mrs. Burdick") and Cherie Overend ("Ms. Overend") on August 17, 1995. At the request of the UST, the hearing was adjourned to September 8, 1995, in order to hear the testimony of Victoria Layaw ("Mrs. Layaw"). Although served with notice of the evidentiary hearing, Dattolo failed to appear and was not represented by counsel at either hearing.[1]

At the conclusion of the hearing held on September 8, 1995, the UST apprised the Court that he had, on August 21, 1995, commenced adversary proceedings against Dattolo in each of the three cases seeking an

---

**1.** Dattolo was served with the Notice and Amended Notice of the hearings in connection with both the Layaw and Overend cases. Although not served with Notice of the Hearing scheduled for August 17, 1996, in connection with the Burdick case, the Court made a finding that she had been given adequate notice by virtue of the Court's letter of July 14, 1995, in which it agreed to consolidate the evidentiary hearings in all three cases.

order enjoining her from acting as a bankruptcy petition preparer pursuant to Code § 110(j)(1) and from engaging in the unauthorized practice of law pursuant to Code § 110(k). Dattolo was served with the Summons and Complaint in each of the three adversary proceedings on August 23, 1995. The UST requested that the Court delay rendering its decision on the motions herein until it could be determined whether Dattolo would file an answer in the adversary proceedings. Dattolo failed to timely file an answer, and the Court granted a default judgment under Rule 7055(b) of the Federal Rules of Bankruptcy Procedure ("Fed. R.Bankr.P.") in the Overend and Layaw adversary proceedings on October 12, 1995, and in the Burdick adversary proceeding on October 13, 1995. The matter presently before the Court was deemed submitted for decision on October 13, 1995.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), and (b)(2)(A).

## FACTS

### In re Harold and Victoria Layaw

The Court heard testimony from Mrs. Layaw that she and her husband had decided to file bankruptcy sometime between the end of October, 1994 and the beginning of November, 1994. Pursuant to an advertisement in a local community newspaper, *The Pennysaver*, they contacted Dattolo requesting that she assist them in filing their petition.[2] It was Mrs. Layaw's testimony that she and her husband went to Dattolo's house on November 12, 1994, with all their bills. Dattolo took personal information from them, including their names, social security numbers, address and Mr. Layaw's place of employment. At the meeting, Mrs. Layaw wrote a check made payable to "Pat Dattolo" in the amount of $175 (*see* UST's Exhibit 10). On January 14, 1995, the Layaws met with Dattolo again to sign their petition. Although Dattolo reviewed the petition with the Layaws, she did not furnish them with a copy. The Layaws provided Dattolo with a certified bank draft made payable to the U.S. Bankruptcy Court in the amount of $160 and on January 23, 1995, their petition was filed. Thereafter, the Layaws received notice of the § 341 Meeting of Creditors ("§ 341 Meeting") scheduled for February 23, 1995, in Syracuse, New York.

On February 22, 1995, Dattolo called the Layaws and requested that they not mention her name as having been the one who prepared their petition. If asked whether anyone had completed the petition for them, they were to say that a "friend helped me." Dattolo informed the Layaws that she had forgotten to renew her license and had only recently sent in the necessary $5,000 fee.

Mrs. Layaw testified that at the § 341 Meeting she initially denied that anyone had assisted her in the preparation of the petition and then admitted that a friend had helped her. Following the meeting, Mrs. Layaw contacted Dattolo and informed her that the Chapter 7 Trustee had mentioned Dattolo by name. Dattolo explained to her that the Trustee was out to get her because he was losing business as a result of the services provided by Dattolo.

Pursuant to a motion filed by the UST on March 7, 1995, the Court granted an Order on April 7, 1995, for an examination of the Layaws pursuant to Fed.R.Bankr.P. 2004 ("2004 Exam"). Upon receiving notice of the 2004 Exam, Mrs. Layaw testified that she called Dattolo "in a panic" and was informed by Dattolo that she (Dattolo) was being investigated by the UST. Dattolo requested to meet with Mrs. Layaw and asked that she sign a document stating that Dattolo had merely typed the Layaws' petition. She also requested that Mrs. Layaw copy the information contained in their petition onto a new form in her own handwriting. It was Mrs. Layaw's testimony that she signed the document without reading it and could not recall whether it had also stated that Dattolo had not provided any legal advice to the Layaws.

---

**2.** The advertisement stated, "FILE BANKRUPTCY. No $90 gimmicks. No Exorbitant Attorney Fees! Exp Bankruptcy Paralegal to do all paperwork/filing, flat fee $175. Leave the Worrying to me 476–2524." *See* UST's Exhibit 6.

Mrs. Layaw admitted that she had completed a petition in her own handwriting as Dattolo had requested. Dattolo also asked that Mrs. Layaw not mention her name at the 2004 Exam and if asked, Mrs. Layaw was to indicate that she had sent for a bankruptcy kit which she and her husband had completed on their own.

At the 2004 Exam Mrs. Layaw testified under oath that she had ordered a bankruptcy kit and had later sought the assistance of Dattolo to complete the forms. It was Mrs. Layaw's testimony before this Court that subsequent to the 2004 Exam she contacted the UST for the purpose of straightening out the inconsistencies in her statements made at the § 341 Meeting and the 2004 Exam, explaining that "I still don't know why I did it, other than I felt sorry for her."

*In re Scott and Joyce Burdick*

Mrs. Burdick testified that sometime in July 1994 she consulted with her mother about the advisability of filing bankruptcy. Eventually, she sent all of their bills out to her mother in Oregon in order for her to complete the necessary forms. At her mother's suggestion, that it would be advisable to consult with someone concerning whether the forms complied with New York laws, the Burdicks contacted Dattolo, after reading an advertisement in *The Pennysaver*. Mrs. Burdick met with Dattolo on or about January 13, 1995, and was quoted a fee of $125 based on the fact that the forms had already been completed by Mrs. Burdick's mother. Dattolo explained that it would be necessary to transfer the information from the forms used by Mrs. Burdick's mother to a five-part form preferred by the bankruptcy court. Dattolo also increased her fee from $125 to $150 based on the fact that the Burdicks had in excess of 100 creditors.

On January 19, 1995, Mrs. Burdick paid Dattolo $150 and on January 27, 1995, she paid an additional $160 filing fee in the form of a money order made payable to the U.S. Bankruptcy Court. The Burdicks signed their petition on January 27, 1995, but were not provided with a copy at that time (*see* UST's Exhibit 2).

On or about February 3, 1995, in response to Mrs. Burdick's call, Dattolo gave her a docket number which was to have been effective January 30, 1995. Mrs. Burdick testified that she had contacted various creditors and had given them the number. On or about February 17, 1995, she called the Bankruptcy Court Clerk's Office ("Clerk's Office") and was informed by one of the clerks that the docket number the Burdicks had been given was not correct. When confronted with the fraudulent docket number, Dattolo explained that there had been a mistake and the number she had been given by a friend in the Clerk's Office was only a temporary one which had been assigned while the Burdicks' petition was being reviewed. According to Mrs. Burdick, Dattolo suggested that the Burdicks wait until Friday, February 24, 1995, before again checking with the Clerk's Office so as not to raise any "red flags." On February 23, 1995, the deputy clerk with whom Mrs. Burdick had previously spoken, called her and informed her that their petition had been filed that day.

On March 22, 1995, the day prior to the scheduled § 341 Meeting, Dattolo called the Burdicks requesting that they not mention her name at the meeting. It was Mrs. Burdick's testimony that Dattolo explained that another debtor had indicated that she/he had received assistance from his/her "lawyer", i.e. Dattolo, in completing the petition, and the New York State Attorney General's Office was investigating the matter. Dattolo suggested to the Burdicks that mentioning her name at the § 341 Meeting would only result in "red flags." However, at the § 341 Meeting, Mrs. Burdick admitted to the Chapter 7 Trustee that Dattolo had prepared their petition.

*In re Cherie Overend*

In response to an advertisement in *The Pennysaver*, Ms. Overend testified that she contacted Dattolo in December 1994 and was advised that it would cost her $150 for Dattolo to complete her petition. Dattolo came to Ms. Overend's residence and completed the forms. She returned to Ms. Overend's residence on January 5, 1995, with the typed petition, which she had Ms. Overend sign (*see* UST's Exhibit 3). Dattolo did not provide a copy to her at that time. According to the

case docket, the petition was filed on January 12, 1995.

The § 341 Meeting was scheduled for February 9, 1995. The day before the § 341 Meeting, Dattolo called Ms. Overend to remind the debtor that if she was asked who prepared her petition, she was to say that she had completed it herself. According to Ms. Overend, Dattolo explained that she had just received notice that her license was up for renewal and suggested that the court might not approve Ms. Overend's bankruptcy filing if they knew the petition had been prepared by Dattolo. Ms. Overend testified that at the § 341 Meeting she had mentioned that Dattolo had prepared her petition, but did not elaborate on who Dattolo was.

In April 1995, Ms. Overend received notice of the 2004 Exam and contacted Dattolo. According to Ms. Overend, Dattolo "brushed it off," indicating that someone had claimed that she was a lawyer. Dattolo requested that Ms. Overend sign a statement, which Dattolo had predated for December 21, 1994, to the effect that she (Dattolo) had only typed Ms. Overend's petition (*see* UST's Exhibit 5). Ms. Overend testified that Dattolo had suggested that Ms. Overend tell the UST that she had obtained the forms at "The Paper Cutter" and that her mother had helped her complete them. At the 2004 Exam it was Ms. Overend's testimony that she had broken down and had admitted to the UST under oath that Dattolo had completed the petition, explaining to the UST that Dattolo had told her that if the UST learned that Dattolo had completed Ms. Overend's petition, it might jeopardize her bankruptcy case.

*Additional Testimony*

In addition to the testimony of the debtors who filed the three cases which have been consolidated for purposes of this decision, the UST also called three other witnesses who had had prior dealings with Dattolo. The first of these witnesses, Pamela Haseman ("Haseman"), testified that she had paid Dattolo $150 on January 21, 1995, to complete her petition. She also paid the filing fee of $160 in installments to Dattolo on January 24, 1995, and February 9, 1995 (*see* UST's Exhibit 12). Dattolo apprised her that it would take 2–3 weeks to obtain a docket number. After several calls to Dattolo, she was given a docket number and a filing date of February 20, 1995. Haseman then proceeded to give the information to her creditors. It was Haseman's testimony that Dattolo had informed her that she could expect to wait 2–3 months before having to attend the § 341 Meeting. In April 1995, after having heard nothing, she left several messages on Dattolo's answering machine, but none of her calls were returned. Sometime in June 1995, she called the Clerk's Office and learned that the number she had been given was incorrect and no petition had been filed on her behalf. Haseman testified that she contacted the local bar association, the Legal Aid Society, and the Consumer Protection Bureau. She then filed a claim in Small Claims Court and also filed a complaint with the New York State Attorney General's office on or about June 18, 1995 (*see* UST's Exhibit 13).

In a letter dated June 25, 1995, and addressed to Haseman, Dattolo enclosed a refund of $310 (*see* UST's Exhibit 9). In the letter Dattolo explained that in April 1995, she had signed an "Assurance of Discontinuance" with the New York State Attorney General's Office in which she agreed *inter alia* to cease "operating as a business engaging in the drafting or preparation of legal documents . . ." (*see* UST's Exhibit 4). As a result, Dattolo alleged that she had hired a part-time assistant to return all monies and paperwork received from prospective debtors. Instead of returning both the money and the paperwork, Dattolo alleged that the assistant had stolen the money. Dattolo also explained that she had not returned Haseman's phone calls because her answering machine was not operating properly and she had not received any messages. Haseman acknowledged to the Court that despite the lengthy delay, she still planned to file a bankruptcy petition and had contacted the Legal Aid Society in this regard.

Also asked to testify was Adam Rech ("Rech"), who had also responded to Dattolo's advertisement in *The Pennysaver*. While unable to recall any dates, it was his testimony that he and his wife met Dattolo at

her house and paid her $80 of a $150 fee. The Rechs provided the information requested in the petition under Dattolo's direction and then signed the document. They were told it would take approximately three weeks to get a docket number. Rech testified that Dattolo told him and his wife that she would call them with their docket number and the date of the § 341 Meeting. Approximately two weeks after their initial meeting, the Rechs sent Dattolo the balance of her fee, i.e. $70, along with money order in the amount of $160 for the filing fee. Rech testified that as a result of various creditors attempting to garnish his wages, he tried without success to contact Dattolo to obtain the docket number. He then had his boss' wife call and leave a message with Dattolo indicating that she wished to file bankruptcy and requesting that Dattolo call her at her office. When Dattolo returned her call, it was Rech that spoke with her. Dattolo agreed to contact his creditors and provided him with a docket number and the date for the § 341 Meeting. On Friday, June 23, 1995, Rech appeared in Syracuse for the § 341 Meeting only to discover that there were no meetings held on Fridays. Mrs. Rech contacted the Clerk's Office and was informed that there was no record of their petition and that the docket number they had been given was two years old. Rech testified that he contacted Dattolo and threatened to bring charges against her. Dattolo responded that there had been a couple of recent deaths in her family and she herself was scheduled to have an operation, making it impossible for her to complete the Rechs' bankruptcy filing. In a letter dated June 25, 1995, she agreed to refund the Rechs' money and to return their paperwork to them (see UST's Exhibit 8). Rech concluded his testimony by indicating that he had contacted a lawyer and was in the process of filing a Chapter 7 petition.

Raymond Merwin ("Merwin") testified that he had paid Dattolo $135 at the time of his first meeting with her although he could not recall the exact date. On March 8, 1995, he paid her the filing fee of $160 and was told by her that it would not be necessary to pay her the additional $40 of her $175 fee. Mer-

win also signed the petition on March 8, 1995, and was told by Dattolo that it would take approximately 6–8 weeks before he would receive a docket number and notification of the § 341 Meeting. In May 1995 Merwin became concerned and called Dattolo to obtain the docket number. He was informed that the § 341 Meeting was scheduled for Friday, June 24, 1995.[3] Merwin testified that on that Friday he called the Clerk's Office, as well as the UST's Office, and learned that there was no meeting scheduled that day. He also was apprised of the fact that no petition had been filed in his name and that the docket number he had been given by Dattolo had not been assigned to him. It was Merwin's testimony that he had not contacted any of his creditors to apprise them of the docket number. He also testified that he still intended to file a petition.

The UST elicited testimony from the various witnesses to the effect that Dattolo had not listed her name, address or social security number on any of the petitions. Nor had she signed any of the petitions. Ms. Overend testified that Dattolo had explained to her that since she was not an attorney, her name did not have to appear on the petition. The witnesses also testified that Dattolo had claimed to have worked for a judge for approximately 20 years and that she had extensive experience in filing bankruptcy petitions. According to Ms. Overend, Dattolo had told her that she should list various items, including household goods and clothing, as assets. Dattolo did not explain to her what items she was entitled to exempt. Schedule C of Ms. Overend's petition does not list any property claimed as exempt even though she listed $500 in household goods and furnishings and $200 in wearing apparel, as well as a $290 security deposit on her apartment (see UST's Exhibit 3). The petition filed by Dattolo on behalf of the Layaws also lists no property as being claimed as exempt although the debtors listed in Schedule C of their petition $50 in a checking account, $700 in household goods and $250 in wearing apparel (see UST's Exhibit 1). The Burdicks' petition, which allegedly was completed by Mrs. Bur-

3. Friday was actually June 23, 1995, as Rech previously testified.

dick's mother to a large extent, does include exemptions of $750 in household furnishings and $200 for clothing without citing the statutory basis for said exemptions (*see* UST's Exhibit 2).

### DISCUSSION

Let all individuals who are preying upon the misery and misfortune of poor people by taking their last dollars for false counsel, beware. The full power of the court will be used to discover and appropriately sanction such wrongdoers. *In re Hidalgo,* 96 B.R. 389, 390 (Bankr.S.D.Fl.1988) (Cristol, J.)

■ With the enactment of the Bankruptcy Reform Act of 1994, Congress gave bankruptcy courts the statutory authority to impose sanctions on bankruptcy petition preparers who fail to comply with the provisions of the Code. *See* Code § 110 (applicable to cases filed on or after October 22, 1994[4]).

Code § 110(a) defines a "bankruptcy petition preparer" as "a person other than an attorney or an employee of an attorney, who prepares for compensation a document for filing," including a petition. According to Ms. Overend's testimony, Dattolo's explanation for not having to sign her petition was that she was not an attorney. The various witnesses testified that Dattolo described herself as a paralegal with years of experience working for a judge. However, there was no evidence presented that Dattolo was employed by an attorney as a paralegal at the time she prepared the petitions. Based on the testimony, it is clear that Dattolo qualifies as a "bankruptcy petition preparer."

Contrary to her statement to Ms. Overend that she was not required to sign the petition since she was not an attorney, Code § 110(b)(1) requires that a petition preparer sign any document prepared for filing and print his/her name and address on the document. Code § 110(c)(1) also requires that the petition preparer include an identifying number after the signature. In the case of

an individual, that number is the petition preparer's social security number.

None of the petitions admitted into evidence contained any information that would indicate that they had been prepared by Dattolo. She failed to list her name, address and social security number on any of the petitions, and the only signatures to appear on the petitions were those of the individual debtors.

Code § 110(d)(1) also requires the petition preparer to furnish the debtor with a copy of the petition at the time it is presented for signature. The debtors who testified at the hearing all acknowledged that they had not been given a copy of their petition at the time they were asked to sign it.

■ Code § 110(f)(1) prohibits a petition preparer from including the word "legal" or "any similar term" in any advertisement. In this case, Dattolo described herself as an "Exp Bankruptcy **Paralegal**" (emphasis added) in her advertisement in *The Pennysaver* (see UST's Exhibit 6). The Court finds that "Paralegal" is a "similar term" and falls within the prohibition of Code § 110(f)(1).

A petition preparer is also prohibited from collecting or receiving payment from a debtor of filing fees pursuant to Code § 110(g)(1). There was testimony to the effect that Dattolo had requested and received from the debtors certified bank drafts or money orders made payable to the U.S. Bankruptcy Court in the amount of $160 each to cover the required filing fee.

■ All of the above-referenced subsections of Code § 110 which the Court has determined were violated by Dattolo, namely §§ 110(b)(1), (c)(1), (d)(1), (f)(1) and (g)(1), provide for a maximum fine of $500 for each violation. *See* Code §§ 110(b)(2), (c)(3), (d)(2), (f)(2) and (g)(2). Although the Court heard testimony from six "clients" of Dattolo, documents were actually prepared and *filed* by Dattolo on behalf of only three, namely the Layaws, the Burdicks and Ms. Overend. There is a potential for a maximum fine of

---

4. Code § 110 is applicable to the three cases herein as all of them were commenced after October 22, 1994.

$2,500 in each of those three cases or an aggregate of $7,500.[5]

Dattolo failed to appear at either evidentiary hearing and failed to file any papers that would establish reasonable cause for the various violations of Code § 110. The fact that Congress elected to provide a cap on the amount of the fine that the Court may impose for each violation of Code § 110 makes it clear that any determination regarding sanctions warrants a careful examination of the totality of the circumstances in each case. Indeed, a review of the caselaw following the enactment of Code § 110 and its application to cases commenced on or after October 22, 1994, reveals varied approaches depending on the particular circumstances.

For instance, Hon. Robert E. Littlefield, Jr., the U.S. Bankruptcy Judge for this district, sitting in Albany, New York, concluded that he would take a somewhat lenient approach in light of the fact that Code § 110 had only recently been enacted.[6] *See Moore, supra,* slip op. at 6. Accordingly, he required the petition preparer to turn over $150 to the trustee pursuant to Code § 110(h)(2) and imposed a fine of $100, which amounted to the balance of the fee paid to the preparer, for his violations of Code § 110(b)(1), (c)(1) and (g)(1).

In *In re Cordero,* 185 B.R. 882, 884 (Bankr. M.D.Fla.1995), the court found that the petition preparer was aware of Code § 110 and had "engaged in a pattern of deceptive practices [including misrepresenting the amount of the fee paid to her] intended to circumvent the restrictions imposed upon bankruptcy preparers and with the intention of deceiving the Court." The court concluded that a "significant sanction" for each violation was appropriate and imposed a fine of $250 for each of three violations for a total of $750. *Id.* at

885. In addition, the court required that the petition preparer turn over $125 of the $175 fee paid to her by the debtor to the Chapter 7 trustee, having determined that $50 was a reasonable fee for the services she had rendered.

In *In re Lyvers,* 179 B.R. 837 (Bankr. W.D.Ky.1995), the court considered four cases in which the petitions had been filed by an individual holding himself out as a "typist" of bankruptcy petitions. Only two of the cases had been filed after October 22, 1994. In one case, the court found the petition preparer's fees of $195 excessive and required him to refund them to the debtors. In the other case, the court imposed a $500 fine on the petition preparer for having signed and filed a motion to dismiss the case on behalf of a debtor who testified that he did not want his case dismissed.

In *In re Gavin,* 181 B.R. 814 (Bankr. E.D.Pa.), *opn. and order adopted,* 184 B.R. 670 (E.D.Pa.1995), the bankruptcy court not only enjoined the bankruptcy petition preparer from offering its services in any jurisdiction in the country without *inter alia* first obtaining express permission from the local bankruptcy court in the particular jurisdiction in which it wished to operate pursuant to Code § 110(j) but also certified the matter to the district court for imposition of penalties pursuant to Code § 110(i). In addition to requiring the petition preparer to turn over any fee found to be in excess of the services rendered pursuant to Code § 110(h), the court imposed a fine of $1,000 in connection with several violations of Code § 110 in the two cases under consideration. *See id.* at 824. The court declined to impose the maximum fine authorized by Code § 110 because of its concern that it would discourage pay-

---

5. The sanctions provided for in Code § 110 apply to any document prepared for filing. Technically, the statute could be construed to require that the preparer's name, address, signature and social security number be included not only on the petition, but also the schedules and statement of financial affairs filed on behalf of each debtor. Potentially, the maximum fine for the filing of three separate documents in each of these three cases would be $7,500 or an aggregate of $22,-500. *See In re Moore,* Case No. 95–11035, slip op. at 4 (Bankr.N.D.N.Y., August 15, 1995) (*dicta*) (With respect to debtor's (i) petition, (ii)

schedules, (iii) statement of financial affairs and (iv) statement of intention, failure to comply with Code § 110(b)(1) exposes preparer to up to $2,000 in fines under Code § 110(b)(2).) However, in the situation where the schedules and statements are included with the petition at the time of filing, the Court finds that for purposes of Code § 110 a single document has been filed.

6. In *Moore* the debtor's petition was filed on March 22, 1995.

ment to the "victimized debtors" should they avail themselves of the relief provided in Code § 110(i). *See id.*

But for her numerous misrepresentations made to the six individuals from whom the Court heard testimony and her attempts to suborn perjury, the Court might feel inclined to be lenient with Dattolo since the three cases were filed within four months of the enactment of Code § 110. However, based on the testimony heard by this Court and Dattolo's blatant efforts to deceive it, the Court concludes that a fine of $150 for each violation of the various subsections of Code § 110 is appropriate or a total of $750 in each of the three cases for an aggregate fine of $2,250.

■ In addition, Code § 110(h)(1) requires the petition preparer to file within 10 days after the filing of a petition a declaration disclosing any fee received from or on behalf of a debtor within 12 months prior to filing. A review of the dockets in each of the three cases herein establishes that Dattolo failed to comply with Code § 110(h)(1).[7] Code § 110(h)(2) requires the Court to order the immediate turnover of any fee received by the petition preparer that is deemed to be in excess of the value of the services rendered for the documents prepared.

The Court has reviewed the three petitions prepared by Dattolo which were admitted into evidence at the hearing (*see* UST's Exhibits 1, 2, and 3). Other than the lengthy list of unsecured creditors in the Burdicks' case, which for the most part was typed by Mrs. Burdick's mother, the three petitions in evidence appear rather straightforward. In addition to a brief list of assets, the debtors listed no secured creditors. Only in the Layaws' case were there any priority creditors. The various questions in the Statements of

Affairs were simply responded to by checking "None."

■ Dattolo accepted $150 from the Burdicks and Ms. Overend for her services in preparing and filing the petitions. She received $175 from the Layaws. The UST has included in his motion a request for an order turning over said monies in their entirety. Keeping in mind that the only legitimate service performed by Dattolo was the actual typing of the petitions, the Court finds that $50 is a reasonable fee for having a Chapter 7 petition, schedules and statement of affairs, such as those in evidence, typed. *See Cordero, supra,* 185 B.R. at 884 (citing *In re Cochran,* 164 B.R. 366, 369 (Bankr.M.D.Fla. 1994)). Under the circumstances, the Court concludes Dattolo should be required to turnover $100 to the Chapter 7 trustee in the Burdicks' and Overend cases and $125 in the Layaws' case.[8]

■ In rendering its decision, the Court must also consider its obligation to certify to the District Court not only any violations of Code § 110, but also any fraudulent, unfair or deceptive act committed by the petition preparer pursuant to Code § 110(i)(1).[9] Since the Court has ordered the turnover of $100–$125 to the Chapter 7 trustees for exemption by the Debtors in the three cases pursuant to Code § 110(h)(2), which incorporates by reference Code § 522(b), and all the Debtors have received a discharge, there are no actual damages to be awarded and approved by the District Court, making Code § 110(i)(1)(A) inapplicable. However, in addition to reimbursing the Debtors for any actual damages, Code § 110(i)(1)(B) permits the recovery of the greater of (i) $2,000 or (ii) twice the amount paid by the Debtor(s) in each case to Dattolo, as well as attorney's

---

7. A Bankruptcy Judge may take judicial notice of the Court's records. *Matter of Holly's, Inc.,* 172 B.R. 545, 553 n. 5 (Bankr.W.D.Mich.1994); *see also In re Calder,* 907 F.2d 953, 955 n. 2 (10th Cir.1990) (Court took judicial notice of the *contents* of debtor's schedules and not the truthfulness of the assertions therein.)

8. Code § 110(h)(4) imposes a maximum fine of $500 for each failure to comply with the court's order to turn over such funds within 30 days of service of the order.

9. While Code § 110(i)(1) also requires the Court to certify to the District Court that a bankruptcy case or related proceeding has been dismissed as a result of a petition preparer's negligence or intentional disregard of the Code and the Fed. R.Bankr.P., in the three cases now before this Court, all of the debtors received a discharge pursuant to Code § 727(a).

fees and costs, should the Debtor(s) elect to file a motion under Code § 110(i).[10] *See generally Gavin, supra,* 181 B.R. at 824.

In these three cases, as well as in those cases for which petitions were never filed, Dattolo's actions demonstrated a blatant disregard and lack of respect for the legal system and the bankruptcy process, in particular. The debtors for whom petitions were filed were asked to perjure themselves, thereby jeopardizing the discharge to which they might otherwise be entitled. Having the debtors sign false statements as to the services rendered by Dattolo was entirely self-serving as were her suggestions to the debtors that acknowledging her role in the preparation of their petitions would result in "red flags" and possible dismissal of their cases. These certainly constitute unfair and deceptive acts on Dattolo's part.

Further evidence of such acts was provided by the testimony of the three individuals whose petitions were not filed by Dattolo. Haseman, Rech and Merwin all testified that Dattolo provided them with false docket numbers to submit to their various creditors. Rech and Merwin were also given dates for a § 341 Meeting which they later learned was not scheduled. As a result of their dealings with Dattolo, the three experienced unnecessary delay in gaining the "fresh start" to which they are entitled under the Code. Despite the delay and the frustrations they encountered, all three did indicate that they intended to proceed with the filing of a bankruptcy petition.

All of the witnesses acknowledged that they were unfamiliar with the bankruptcy process and their rights thereunder. Dattolo preyed on that ignorance, causing anxiety and potential harm to the individuals seeking her advice and assistance as a result of her misrepresentations. The Court empathizes with the wish of these individuals to avail themselves of the benefits provided them under the Code. At the same time, they should recognize that in an attempt to "leave the worrying" to someone like Dattolo, they subjected themselves to the possibility of the

loss of exemptions they might otherwise be entitled and also the possibility of the loss of a discharge had their petitions and schedules included inaccuracies and/or omissions which were brought to the attention of the Court. Substantial expertise is required if the bankruptcy forms are to be completed accurately. Furthermore, individuals are entitled to receive accurate information on which they may make an intelligent decision regarding filing a bankruptcy petition. There is a role to be played by qualified bankruptcy petition preparers and Code § 110 acknowledges that fact. At the same time, in enacting Code § 110, Congress also acknowledged that "[t]hese preparers often lack the necessary legal training and ethics regulation to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system." H.R.Rep. 103–834, 103rd Cong., 2nd Sess. 40–41 (Oct. 4, 1994); 140 Cong.Rec. H10770 (Oct. 4, 1994). Accordingly, Congress has provided the Court with the authority to oversee abuses perpetrated by unqualified and unprincipled petition preparers, and this Court will not hesitate to exercise that authority under the appropriate circumstances. Therefore, the Court concludes that it is appropriate to certify these cases to the District Court.

Based on the foregoing, it is hereby

ORDERED pursuant to Code §§ 110(b)(2), (c)(3), (d)(2), (f)(2) and (g)(2) for the violation of Code §§ 110(b)(1), (c)(1), (d)(1), (f)(1) and (g)(1), Patricia Dattolo shall be fined $750 in each of the three cases herein for the total sum of $2,250, which shall be payable to Richard G. Zeh, Sr., James T. Foley U.S. Courthouse, P.O. Box 398, Albany, New York 12201–0398, within sixty (60) days of the date of this Order; it is further

ORDERED that Patricia Dattolo is limited to a reasonable fee of $50 for services rendered as a bankruptcy petition preparer in each of the three cases herein, or a total of $150; it is further

---

10. Code § 110(i)(2) also makes provision for the payment to the trustee or creditor of an additional $1,000, plus reasonable attorneys' fees and costs, in the event that either of them elects to file the motion on behalf of a debtor.

ORDERED that Patricia Dattolo turn over the sum of $100 in the Overend case to Mary E. Leonard, Esq., Chapter 7 trustee, 26 North Main Street, Cortland, New York 13045; $100 in the Burdick case to Allan J. Bentkofsky, Esq., Metcalf Plaza, Suite 504, Genesee Street, Auburn, New York 13021, and $125 in the Layaw case to Lee E. Woodard, Esq., One Lincoln Center, Suite 300, Syracuse, New York 13201; it is further

DECREED that the Court shall reserve jurisdiction for sanctions provided by Code § 110(h)(4) in the event that Patricia Dattolo fails to timely comply with this Order, and it is further

ORDERED that a Transmittal and Certificate of Facts pursuant to Code § 110(i)(1) is being forwarded to the District Court contemporaneously herewith transmitting the finding of violations of Code §§ 110(b)(1), (c)(1), (d)(1), (f)(1), (g)(1) and (h)(1), and also the finding that Patricia Dattolo has engaged in a pattern of deceptive practices intended to deceive the Court and circumvent the provisions of Code § 110 without reasonable cause.